Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
**MCCUNE LAW GROUP**
18565 Jamboree Road, Suite 550
Irvine, California 91761
Telephone: (909) 557-1250

Derek Y. Brandt*
dyb@mccunewright.com
Leigh M. Perica*
lmp@mccunewright.com
Connor P. Lemire*
cpl@mccunewright.com
**MCCUNE LAW GROUP**
231 North Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116

*Attorneys for Plaintiff*

*Pro Hac Vice
Additional Counsel Listed on Signature Page

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ML PRODUCTS INC.<br><br>Plaintiff,<br><br>v.<br><br>ASTER GRAPHICS, INC.; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 5:23-cv-2094<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. Violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*;<br>2. Violations of California Bus. & Prof. Code § 17200, *et seq.;*<br>3. Violations of Cal. Bus. & Prof. Code § 17500, *et seq.* |

NOW COMES Plaintiff ML Products Inc., with knowledge as to its own actions and events, and upon information and belief as to other matters, and alleges as follows against Defendants Aster Graphics, Inc., and Does 1-25 (together, "Defendants"):

## I.

## NATURE OF THE ACTION[1]

1.      This is a case about unfair competition. Defendants, who are sellers of third-party printer ink and toner cartridges on the Amazon.com online sales platform, have successfully deployed numerous false, deceptive, unfair, or otherwise unlawful tactics in order to inflate their retail sales at the expense of sales by Plaintiff ML Products Inc., a competing third-party ink and toner seller. Third-party ink and toner cartridges generate an estimated $350 million or more in annual sales on Amazon. Sellers, including ML Products and Defendants, compete for those sales. Defendants, however, have dominated the market through their deceptive and unlawful actions as described herein, and ML Products Inc. has as a result been cheated out of millions of dollars in sales.

2.      Sales on Amazon are driven to an overwhelming extent by a product's placement among the relevant products in Amazon's organic search results based on keyword searching. As relevant here, consumers search Amazon for ink and toner compatible with their printer and then purchase a product from among those offered by sellers. The ink/toners offered in the search results typically include the Original Equipment Manufacturer (OEM) brand for the relevant printer along with third-party private label brands, such as those sold by Plaintiff and/or Defendants. Amazon uses an algorithm to prioritize the items offered in the organic search results for each keyword search. A limited number of products appear on the first page of search results and other competing products on sequential pages thereafter. Most shoppers never look beyond

---

[1] ML Products files this Complaint as directed by a September 28, 2023 Order entitled "Severance of Action" 148 in *ML Products v. Ninestar Technology Co., Ltd., et al.*, No. 21-cv-1930-MEMF-KK [Dkt. 148]. Factual allegations from ML Products' original Complaint [Dkt. 1] are unaltered here are as asserted in that action. Unaltered citations are, likewise, as they existed on the date the Complaint originally was filed in that action.

Amazon's first page of search results and most purchases are made from among the first few listings in the organic search results. A listing appearing at the top of the organic search results is, accordingly, critical to sales.

3.      Defendants' tactics, individually and collectively, are designed to manipulate Amazon's algorithm into artificially elevating their listings to higher priority positions in the organic search results for keywords relating to ink and toner. Defendants employ these tactics so that their products appear higher up and on the first page or pages of search results and thus garner greater sales while at the same time bumping down their competitors' products and thus decreasing their competitors' sales. These tactics have been successful. Academic research has demonstrated that Amazon rating manipulation has a large causal effect on sales.

4.      To achieve these inflated sales, which are made at the expense of honest sellers like Plaintiff, Defendants employ some or all of the following tactics:

- commissioning fake product reviews;

- compensating customers for product reviews or to change or remove negative product reviews;

- manipulating sales rank by accepting fake orders that Defendants themselves pay for;

- use of "ghost" accounts to manufacture the false impression of interest in or sales of products, to inflate product ratings, and/or to manipulate the "helpful" voting for (likely false) positive reviews of Defendants' products; and

- review "repurposing," including (i) reusing older product listings (and their accompanying review history) with new product offerings in order falsely to capitalize on past sales and review history for new products and (ii) "variation" manipulation achieved by falsely treating different toner and ink products as variations of a single offering in order falsely to share in the ratings, reviews, and status of each other.

5.      Amazon itself asserts that "fair competition in Amazon's stores depend[s]" on the "authenticity" of customer reviews, and that "[b]ad actors who pay for product reviews … compete unfairly" with honest sellers on the Amazon platform. Amazon labels undisclosed incentivized reviews as "inherently false and misleading" and "likely to mislead customers into believing they are from unbiased and independent customers."[2]

6.      Each of the tactics outlined above employs a deception to manipulate the Amazon algorithm, designed to elevate the product in question to a higher ranking and an earlier position in Amazon's organic search results. Used together, the tactics have an even greater effect—but even that is not the full extent of Defendants' deception.

7.      Defendants exacerbate the impact of these deceptions by deploying them in combination with their use of multiple seller accounts that appear to offer competing products to the consumer. Defendants own, operate, and/or control multiple selling "brands," typically through an opaque web of sham business entities, so that they can occupy not just one of the top spots in Amazon's organic search results, but *multiple* spots. If a single spot high in the organic search results is valuable for generating sales (and it is), then holding multiple high spots is even more valuable. Through this practice, Defendants create the false impression that multiple sellers are competing to sell third-party toner or ink replacements compatible with the consumer's needs, when in fact, these straw-sellers exist only to crowd other potential sellers out of the top search result spots. With this tactic, each Defendants falsely portray themselves as though they are a number of competing sellers for the same product (all of which employ the same ranking manipulation tactics), further enhancing their sales at the expense of honest sellers.

8.      All of these tactics violate Amazon's marketplace rules and seller contract. Defendants' actions constitute false advertising and/or unfair competition under the

---

[2] *See* Complaint at ¶¶ 1-2 in *Amazon.com, Inc. et al. v. DOES 1-5, d/b/a Amztrustedreview.com*, No. 23-2-03317-5-SEA (Superior Ct. State of Washington, King County) (hereafter, "Amztrustedreview Complaint"), one of a number of lawsuits Amazon has filed against individuals and websites that it alleges sell fake review services to bad actors operating Amazon seller accounts.

COMPLAINT

Lanham Act and other laws as described herein. These actions have harmed Plaintiff ML Products Inc., which competes with Defendants for the sale of consumer replacement ink and toner cartridges. ML Products Inc. brings this action for monetary damages and disgorgement of Defendants' ill-gotten profits, along with enhanced or treble damages, preliminary and permanent injunctive relief, and recovery of attorneys' fees and costs of suit.

**II.**

**PARTIES**

**A. Plaintiff**

9.     ML Products Inc. ("ML Products") is a Los Angeles-based online distributor and retailer. Since 1999, ML Products has sold various kinds of toner and ink, making sales to wholesalers, retailers, and consumers. It is presently engaged in the online sale to consumers of replacement toner and ink cartridges on Amazon, where it competes with Defendants for sales. ML Products is organized under the laws of the State of California and its principal place of business is in Thousand Oaks, California.

**B. Defendants**

10.     Defendants, and/or entities under Defendants' control, account for a significant percentage of the third-party ink and toner sales on Amazon through use of the practices complained of throughout this Complaint.

11.     Defendant Aster Graphics, Inc. ("Aster") is a business engaged in the online sale to consumers of replacement toner cartridges on Amazon. Aster is organized under the laws of the State of California and has its principal place of business in Riverside, California. Aster owns, operates, and/or controls, directly or indirectly, a number of ostensibly separate "brands" of replacement toner and ink which are offered for sale in the United States on Amazon. These brands, including a number of shell corporations affiliated therewith, are alter egos of Aster. Aster and these alter ego corporate affiliates and brands are related entities under common ownership and control and are all part of a common

enterprise referred to herein as the "Aster Group." The Aster Group accounts for an estimated $50 million in annual sales of third-party ink and toner on Amazon.

**C. Doe Defendants**

12.    Doe Defendants 1 through 25 represent presently unknown corporate or brand affiliates, or straw sellers owned, operated, or controlled by Aster, who participate or participated in the Aster Group's schemes as described herein or as may be discovered during the pendency of this action.

## III.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over Defendant Aster, by virtue of Aster doing business in this Judicial District and being headquartered in California. This Defendant has also engaged in statutory violations within the State of California and this District.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Defendant conducted, and continues to conduct, business in this District, and a substantial part of the acts and omissions giving rise to the claims occurred, at least in part, within this District. Defendant is headquartered here, maintains offices or facilities here, markets, advertises, and sells the subject products here, and otherwise conducted extensive business, within this District.

## IV.

## FACTUAL ALLEGATIONS

**A. Appearing at the Top of Organic Search Results Is Key to Retail Success on Amazon**

16.    Amazon is the world's largest online retailer, with a market share that far exceeds that of its competitors. Through its Amazon.com online platform, Amazon

dominates the online retail sales market, controlling between 50-70% of all online retail sales in the United States. Amazon holds an even larger market share of multi-seller online retail platforms. Over six million independent, third-party sellers rely on Amazon's online retail platform to sell their own products.  Amazon also hosts 1.7 million active third-party sellers from around the world,[3] about 32 times more than the 54,000 third-party sellers that Walmart.com hosts.[4] A 2020 survey estimated that about 37% of Amazon's third-party sellers, representing over 850,000 sellers, rely on Amazon as their sole source of income.[5]

17.    Most of the products sold on Amazon are sold by third-party sellers rather than by Amazon itself. In 2018, Amazon reported that customers spent $160 billion on items from third-party sellers, which was 58 percent of all sales on the site. More than 1 million sellers joined Amazon marketplaces around the world that year.[6] This growth in retail online shopping has only accelerated. Since the onset of the COVID19 pandemic, Amazon says that it has added 50 million Prime members and has made profits of over $26 billion, more than the previous three years combined.[7]

---

[3] Number of Sellers on Amazon Marketplace, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/number-of-sellers (last visited Sept. 30, 2021); see also Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 116th Cong. (2020) at 5 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("There are now 1.7 million small and medium-sized businesses around the world selling in Amazon's stores.").
[4] Walmart's Fulfillment Service for Sellers Not Seeing Adoption, MARKETPLACE PULSE, https://www.marketplacepulse.com/articles/walmarts-fulfillment-service-for-sellers-not-seeing-adoption (last visited Nov. 12, 2021).
[5] The State of the Amazon Seller JUNGLESCOUT, (2020), https://www.junglescout.com/lp/brand/?utm_source=google&utm_medium=cpc&utm_campaign=JS-DS-EN-USA-S_B-Brand&utm_adgroup=Jungle_Scout-EM&utm_term=jungle%20scout&utm_matchtype=Exact&gclid=CjwKCAiAvriMBhAuEiwA8Cs5lcbaQrN-rcLK2O9y32tEmRSZLvIX8AOdwtl03-NvOpVpOCW0vPY-OxoCXWEQAvD_BwE (last visited Nov. 12, 2021).
[6] Her Amazon Purchases Are Real. The Review Are Fake. (Nicole Nguyen Nov. 20, 2019) https://www.buzzfeednews.com/article/nicolenguyen/her-amazon-purchases-are-real-the-reviews-are-fake (Last visited Nov. 12, 2021).
[7] Fake Reviews and Inflated Ratings Are Still a Problem for Amazon (Nicole Nguyen. June 13, 2021) https://www.wsj.com/articles/fake-reviews-and-inflated-ratings-are-still-a-problem-for-amazon-11623587313 (Last visited Nov. 12, 2021)

18.     In 2018, the *Washington Post* reported that more than half of all online product searches start on Amazon, citing survey data from the digital marketing firm BloomReach. As it concluded: landing among the first ten results on an Amazon search can mean "an explosion in sales."[8]

19.     When a consumer enters a keyword search in the Amazon search bar, Amazon displays a results list that contains "sponsored" results and "organic" results. "Sponsored" results are product listings for which the seller has paid Amazon to list the product in response to certain search keywords. Sponsored results typically appear at or near the top of the list. Consumers generally understand that sponsored results appear at the top of the list only because the seller has paid to have those listings appear there. Many consumers are thus skeptical of sponsored listings. Consumers have a strong preference for products listed in Amazon's "organic" search results. The organic results comprise a list of products that Amazon's algorithm believes will drive consumer sales. The algorithm returns a list of products related to the customer's search using, among other criteria, sales volume, sales conversion rate, and the products with a combination of the highest star ratings and the greatest number of star ratings. Each product is denominated by its own unique Amazon Standard Identification Number (ASIN) and accompanied by an average customer review rating of one to five stars and, usually, text and/or video or image product reviews purportedly authored by consumers who purchased the product.

20.     According to the *Wall Street Journal*, when people search for products on Amazon, almost two-thirds of all product clicks come from the first page of search results. Amazon's search system rankings can thus "make or break" a product, because Amazon's search bar is "the most common way for U.S. shoppers to find items online, and most purchases stem from the first page of search results, according to marketing analytics firm

---

[8] How merchants use Facebook to flood Amazon with fake reviews (Elizabeth Dwoskin and Craig Timberg. April 23, 2018) https://www.washingtonpost.com/business/economy/how-merchants-secretly-use-facebook-to-flood-amazon-with-fake-reviews/2018/04/23/5dad1e30-4392-11e8-8569-26fda6b404c7_story.html (Last visited Nov. 12, 2021).

Jumpshot."[9] Indeed, according to a 2018 article published by Search Engine Journal, Amazon's own data concludes that:

- 70 percent of Amazon customers never click past the first page of search results;

- 35 percent of Amazon shoppers click on the first product featured on a search page;

- The first three items displayed in search results account for 64 percent of clicks; and

- 81 percent of clicks are on brands on the first page of search results.[10]

21.     Accordingly, for sellers on Amazon, it is critical to retail sales that the seller's product appear at or near the top of the list of results and on the first page. Most consumers will never look beyond that page.

22.     This is even more true in the market for third-party private label ink and toner sold on Amazon. Replacement ink and toner cartridges are sold on Amazon as both OEM-branded ink and toner and third-party, or private label, branded products. The OEM-branded ink and toner products—*e.g.*, Canon, Hewlett Packard, Brother, etc.—are compatible with the various models of name-brand printers that the OEMs sell.

23.     Replacement ink and toner is a lucrative source of sales for the OEMs. As OEM manufacturers introduce new hardware to the market along with compatible replacement ink and toner, third-party private label sellers race to keep up with replacement cartridges that are compatible with the new offerings.

…

---

[9] Amazon Changed Search Algorithm in Ways That Boost Its Own Products (Dana Mattioli. Sept. 16, 2019) https://www.wsj.com/articles/amazon-changed-search-algorithm-in-ways-that-boost-its-own-products-11568645345 (Last visited Nov. 12, 2021).

[10] Amazon's Search Engine Ranking Algorithm: What Marketers Need to Know (Loren Baker, Aug. 14, 2018), available at https://www.searchenginejournal.com/amazon-search-engine-ranking-algorithm-explained/265173/ (last visited Nov. 12, 2021).

24.     Although third-party ink and toner comprises hundreds of millions of dollars of sales each year on Amazon, there is very little basis beyond star and review ratings by which consumers can differentiate among competing brands of third-party ink and toner, unlike name-brand OEM ink and toner. For sellers of ink and toner, sponsored listings are generally considered to be a "loss leader," because the cost of sponsorship is greater than the profits one reasonably would expect to earn from the sponsored listings. For these reasons, consumers on Amazon choose from among third-party brands almost entirely on the basis of which ones appear first in the search results and which have the best star ratings. Oftentimes, consumers do not even recall the brand they chose after buying it. "Reviews are more important than a brand," says Fred Diman, CEO of Potoo Solutions, a firm that consults with ecommerce companies. "There's major brands that are being crushed by small direct-to-Amazon or direct-to-consumer brands."[11] It is this search priority ranking determined by the Amazon algorithm that Defendants have consistently manipulated in order unfairly to achieve sales on Amazon.

**B. The Defendants Use Deception and Unfair Practices to Manipulate the Amazon Algorithm and Achieve Sales, to the Detriment of Plaintiff.**

25.     Aster uses a number of deceptive tactics to manipulate the Amazon search results algorithm and to falsely advertise their ink and toner replacement cartridges. Many of the tactics they have employed are common amongst the bad actors on the Amazon platform because of their effectiveness and have been documented by news outlets that report on these behaviors. Set out below are illustrations of some of these tactics, but the reality is that Defendants unleash an ever-changing barrage of deceptive tactics in order to game the Amazon algorithm. Round and round they go, and as soon as Amazon catches up to one black-hat tactic, Defendants switch to another.

26.     One of Defendants' primary deceptive tactics is selling the same ink or toner disguised under multiple different brand names. Amazon permits a seller to list a product

---

[11] What Do Amazon's Star Ratings Really Mean?, available at https://www.wired.com/story/amazon-stars-ratings-calculated/ (last visited Nov. 12, 2021).

only once. But because Amazon allows other sellers to sell competing similar products, Defendants operate multiple selling accounts, under various different names, and use these accounts to sell the same ink or toner under different brand names. Defendants create the (deceptive) appearance of different sellers competing against each other for sales of the same third-party ink or toner product when, in fact, these purportedly different sellers form an interrelated web all operating for the benefit of a single enterprise. This deception provides each such enterprise (*i.e.*, the Aster Group) with a number of unfair advantages over honest sellers who follow Amazon's policies. By selling the same item under different brand names using different seller accounts, Defendants generate more opportunities for their products to land at the top of the organic search results. They also give themselves an opportunity to occupy more than a single spot in the search rankings, which simultaneously pushes down the listings of their actual competitors. Finally, these multiple listings permit Defendants to take greater risks in flaunting Amazon's policies, as the suspension of a single seller account will not eliminate all of the enterprise's sales under other seller accounts.

27.    Using shell companies and multiple brands to sell the same product creates the illusion of competition among these brands even though each sale is orchestrated by and for the benefit of Aster. More importantly, though, this practice crowds out the listings of honest sellers: even if one Aster replacement ink cartridge deserved one spot at or near the top of the organic search results, each additional Aster offering at or near the top of the results pushes another honest seller's product lower in the organic results, where it becomes less and less visible to buyers and likely never to have the opportunity to win sales.

28.    Defendants further ensure that their multiple identical products rise to the top of the search rankings by using a number of different "cheat code" techniques intended to manipulate the Amazon algorithm into artificially awarding them priority in the organic search results. These deceptive tactics include: commissioning fake product reviews; compensating customers for favorable reviews or to change negative reviews; accepting fake orders or orders that they paid for in order to manipulate sales rank; manipulating the

"helpful" voting for reviews; and review "repurposing," including reusing old product listings with new offerings to falsely portray sales and review history for the new product and using false product "variations" in order falsely to share in the ratings, reviews, and status of each other.

29.    These tactics build upon and enhance each other. For example, by accepting orders that they have paid for, Defendants not only increase their sales rank, but also increase their conversion rate and decrease their return rate—metrics that Amazon tracks and uses to prioritize organic search results. The widespread use of fake reviews also artificially increases Defendants' conversion rate. Using these cheat codes in conjunction with their crowding strategy, Defendants artificially boost multiple different listings to the limited number of top spots in the organic search results, effectively shutting out of the market any seller not using these tactics. Unless Amazon punishes the cheating seller, the seller continues to benefit through high sales and honest sellers continue to be pushed unfairly out of the market. Ironically, the more this leads to actual sales, the higher the product is then rated and ranked in organic search results by Amazon's algorithm: a feedback loop fueled by deception.

30.    The following are examples of Aster's deceptive and unfair conduct. These deceptions, by their nature, are designed to remain hidden and opaque. Only discovery in this lawsuit will lift the veil on the totality of Defendants' conduct.

### The Aster Group

31.    The Aster Group sells replacement toners on Amazon for printer brands HP, Canon, Brother, and others. It does so through a group of corporate shell companies and brands that it owns and controls, including at least: Intercon International Corp., Revol Trading, Inc., and Eco Imaging Inc.

### A.   *Aster Alter Ego Sellers*

32.    The Aster Group sells or, in the time relevant to this action, has sold ink and toner on Amazon under at least seven different brand names. Each of these brands and their sham sellers are actually just alter egos of Aster, created or acquired by it in order to offer

the same product under multiple listings, thus crowding the field on Amazon and creating the illusion of competition for sales of those products. In fact, a sale of any one of those "competing" products is a sale by Aster.

33.     The ostensibly competing brands owned or controlled by the Aster Group include, at least, the following:

| Arcon | True Image | Amstech | Cool Toner |
| --- | --- | --- | --- |
| Aztec | Toner Bank | Victoner | |

34.     On March 16, 2022 and September 28, 2023, Planet Image International Limited,

the ultimate parent company of Defendant Aster filed a Securities and Exchange Commission Form F-1 registration statement, which can be found in United States government records at the following SEC web archive address: https://www.sec.gov/Archives/edgar/data/1868395/000121390023080540/ff12023a5_planetimage.htm.

35.     Aster Graphics Inc., (Aster US) was incorporated in March 2011 in the State of California and is wholly-owned by Planet Image International Limited.[12]

36.     Planet Image International Limited is the ultimate holding company and parent of the entire business. Aster Graphics Inc. (Aster US) serves as "the sales

…

---

[12] The SEC Statement explains the following corporate structure: "We commenced our operations in January 2011 as a toner cartridge manufacturer through Jiangxi Yibo E-tech Co., Ltd., or Jiangxi Yibo, a limited liability company established under the laws of the PRC. In March 2011, we incorporated Aster Graphics, Inc., or Aster US, a company incorporated in the State of California. In July 2011, we incorporated Aster Technology Holland B.V., a company incorporated in the Netherlands as a limited liability company. On August 5, 2019, Planet Image International Limited was incorporated under the laws of the Cayman Islands as an exempted company with limited liability. As a result of reorganization, Planet Image International Limited became the ultimate holding company of our Company." https://www.sec.gov/Archives/edgar/data/1868395/000121390023080540/ff12023a5_planetimage.htm at 11.

headquarters" of the business for the North American market and is an indirectly wholly-owned subsidiary of Planet Image International Limited.[13]

37.     Planet Image International Limited manufactures and sells products under at least three brands: TrueImage, CoolToner, and AZtech.[14]

38.     Through Aster Online Company Limited, Planet Image International Limited directly owns 100% of equity interest in 11 limited liability companies that "have no operations but instead purely serve as holding companies for the company's online shops" in various jurisdictions. Those online shops include, among others, Amstech Limited, Aztech Enterprise Limited, Eco Imaging Inc., Revol Trading Inc. and Intercon International Corp.).[15]

39.     One way to illustrate these various corporate interrelationships is to examine the numerous ostensibly competing brands of third-party toner on Amazon that are compatible with popular printers. The following examples elucidate many such relationships and demonstrate that all of these interwoven brands, sham corporations, and straw sellers are simple stand-ins for Aster. Aster itself has acknowledged that these brands are its own throughout its SEC filings. While these examples (and the following relationships) can be discerned through a public document investigation, the full scope of the practice can be ascertained only by discovery in this action.

**ASTER EXAMPLE PRODUCT #1: Hewlett Packard CF248A Compatible Toner**

40.     Aster offers for sale on Amazon toner replacements compatible with the Hewlett  Packard CF248A under at least four brand names, including Arcon, Amstech, Cool Toner, and Toner Bank. These ostensibly competing products, which dominate the search results for this toner, are actually all Aster product offerings.

---

[13] *Id*. at 11, 13, and 65.
[14] *Id*. at 1 and 96.
[15] *Id*. at 11 and 66.

41.    The U.S. Trademark for the brand Arcon is registered to an entity called Intercon International Corp. Intercon International Corp. was registered with the California Secretary of State on November 14, 2012.

42.    The brand Cool Toner is registered to an entity called Eco Imaging Inc. dba Cool Toner. Eco Imaging Inc.'s Statement of Business Information was signed by Claire Huang, who is the same individual that signed Intercon International Corp.'s Statement of Business Information. Huang is listed as an accountant for each of the entities on their Statements of Business Information.

43.    Intercon International Corp. and Eco Imaging Inc. dba Cool Toner filed Statement of Information "No-Change" notices with the Secretary of State on virtually identical dates in November 2020. Corporate records on file with the Secretary of State's office for both also list "SUNDOC FILINGS (C2173790)" as their agent for service of process, which is the same agent listed in the corporate filings of Aster Graphics, Inc., itself.

44.    The U.S. trademarks for Aster and the brands Arcon, True Image, Toner Bank, Cool Toner, and Catch Supplies were all arranged by the same two attorneys at the Law Offices of Steve Qi & Associates.

45.    The Amstech trademark was registered on July 18, 2017, the same day as Arcon and True Image. One week before that and a day prior to Cool Toner on July 10, 2017, the Aztec trademark was registered.

46.    Each of these brands, while ostensibly competing for sales of replacement toner compatible with the Hewlett Packard CF248A is actually an Aster stand-in and alter ego.

**ASTER EXAMPLE PRODUCT #2: HP 201X (CF400X) and 202X Compatible Toner**

47.    As another example, Aster offers for sale on Amazon toner replacements compatible with the HP 201X (CF400X) under at least four brand names, including Arcon, True Image, Aztec, and Catch Supplies. Aster offers for sale on Amazon toner replacements compatible with the HP202x under at least four brand names, including

Arcon, True Image, Amstech, and Toner Bank.These ostensibly competing products, which dominate the search results for these toners, are actually all Aster product offerings.

48.    Like Aster's own registered trademark (and Cool Toner's trademark), the U.S. trademark for the brand True Image was registered by attorney Zixuan Zhou, which likely is a pseudonym for Thomas Z. Zhou, the attorney who registered trademarks for Arcon and Toner Bank. The signatory on True Image's corporate registration, Huai Fu, is a member of the Aster Board of Directors. Like Intercon International Corp. and Eco Imaging dba Cool Toner, the corporate Statement of Business Information for True Image was signed by Claire Huang (and on the identical date of November 28, 2017). In addition, True Image's filed a Statement of Information "No-Change" notice with the Secretary of State on November 16, 2020—the identical date that Intercon International Corp. made its No-Change filing (and 3 days after Eco Imaging's filing). Finally, like Aster, Intercon International Corp., and Eco Imaging dba Cool Toner, corporate filings for True Image list "SUNDOC FILINGS (C2173790)" as its agent for service of process.

49.    As with Arcon and Toner Bank, the U.S. trademark for the brand Catch Supplies was registered by the aforementioned Thomas Z. Zhou. The brand is registered to Catch Supplies, Inc., which—like Aster, Intercon International Corp., True Image, and Cool Toner—nominated SUNDOC FILINGS as its agent for service of process. Catch Supplies' corporate Statement of Business Information was signed by Dan Huang (Intercon International, True Image, and Eco Imaging were signed by Claire Huang), and like those others, its Statement of Information "No Change" form was filed with the Secretary of State in November 2020.

50.    The Amstech trademark was registered on July 18, 2017, the same day as Arcon and True Image. One week before that and a day prior to Cool Toner on July 10, 2017, the Aztec trademark was registered.

51.    Each of these brands, while ostensibly competing for sales of replacement toner compatible with the HP 201X (CF400X) and the HP 202X is actually an Aster stand-in and alter ego.

52.     When a consumer searches for toner on Amazon, the Aster Group shell companies and brands lead the consumer to believe she is choosing from among independently competing companies or brands. In reality, the choice is from among a large number of offerings of the same product sold by and for the benefit of Aster. No matter which of the "different" brands the consumer chooses to purchase, Aster wins the business and makes the sale.

53.     As detailed below, this deceptive use of more than one seller account is a violation of Amazon rules and provides an unfair advantage to Aster at the expense of honest sellers like Plaintiff.

54.     Despite Aster's attempts to conceal its ownership and control of the shell companies and brands, the corporate records pertaining to the shell companies, trademark registrations of the brands, and various public documents all lead back to Aster. Aster's purpose in creating these shell companies and brands is to falsely portray competition among numerous "sellers" and to crowd non-Aster sellers out of the search results, all while driving toner purchases to Aster.

55.     On information and belief, Aster acts in concert with the other shell companies and brands under fictitious names within the Aster Group in order to engage in the conduct complained of in this Complaint.

56.     On information and belief, Aster is jointly and severally responsible for the conduct of the Aster Group complained of herein, including the conduct of the shell companies and fictitious brand entities, which it operates as a single enterprise by commingling resources, assets, operations, commercial activities, incur expenses and achieve profits jointly for the benefit of the combined enterprise, its owners and officers. Numerous of these shell companies share addresses and registration details as described herein. Although they purport to be separate corporations, many appear to have no employees at all. Public records disclose, for instance, that although Aster Graphics, Inc. received a Paycheck Protection Program ("PPP") loan in 2020,
…

1    none of the following "separate" entities did so: Intercon International Crop., Revol
2    Trading, Inc., Amstech Limited, Eco Imaging, Inc., and Catch Supplies, Inc.

3    **B.  *Aster False Advertising***

4    57.    In addition to flooding the marketplace with brands, Aster also manipulates
5    the Amazon search algorithms with incentivized reviews, fake reviews, or other tactics as
6    described in this complaint. Examples of these tactics follow, but these are only examples
7    of tactics Aster uses systematically.

8    **Compensation to Remove or Change Negative Reviews**

9    58.    Customer reviews for Aster products reveal that Aster has pestered customers
10    about truthful negative reviews, attempting to bribe them into removing or changing those
11    reviews:



...

28

59.    One customer updated her review to note having received repeated emails "offering to bribe me so that I would change my review." Aster offered $30 and then a $50 gift card.



60.    Another customer was offered a gift card for a review and stated, "you can't believe some of the reviews because they are bought and paid.":



…

61.    Another customer revealed that they were offered $120 to delete a negative review:



62.    Another customer was offered $50 to remove a negative review of an Aztech product.



…

1

2      63.    Another customer was offered $50 to remove a negative review of an Amstech

3  product.



4

5

6

7

8

9

10

11

12      64.    Another customer was offered $30 to remove a negative review of a

13  CoolToner product, but when the customer didn't remove the review, the customer was

14  offered an increased amount of $50 to remove the negative review.



15

16

17

18

19

20

21

22

23  …

24

25

26

27

28

1

2        65.     Another customer was "harassed" numerous times by Defendant to get the

3   customer to remove a negative review of a TrueImage product in exchange for a gift card

4   or free toner.

5



16   **Paid False Positive Reviews**

17        66.     As discussed further in Section D below, on July 31, 2023, the FTC proposed

18   § 465.4 which, "would prohibit a business from offering compensation or other incentives

19   in exchange for, or conditioned on, the writing or creation of consumer reviews expressing

20   a particular sentiment, whether positive or negative, regarding the product, service, or

21   business that is the subject of the review".[16] [17]

22   _____

23   [16] https://www.federalregister.gov/documents/2023/07/31/2023-15581/trade-regulation-rule-on-the-use-
     of-consumer-reviews-and-testimonials#p-319 . (Last visited Oct. 11, 2023).

24   [17]   The FTC's proposed Rule 465.4 is important because, as alleged above, there are a number of
     individuals and websites that offer fake review services to Amazon sellers. In 2022, Amazon sued one

25   such service, called Rebatest. Amazon alleged that the Rebatest website is "dedicated to the purchase
     and sale of fake reviews[,]" in which sellers agree to refund purchases made by reviewers and pay a fee

26   in exchange for positive product reviews.  Amazon alleged that Rebatest's "entire business model is
     based on allowing sellers to obtain fake reviews and inflated ratings" for products in Amazon's stores

27   and that Rebatest "actively deceiv[es] Amazon's customers[.]"  As noted above, Amazon contends that

28   customer trust and fair competition in Amazon's store depend on the "authenticity" of product reviews,

67.    Aster obtains these false positive reviews and inflated ratings through fake review services and other methods. Some non-exhaustive examples of these methods follow.

68.    Aster compensated customers for favorable reviews and instructed customers how to write reviews:



…

and those who pay for product reviews "erode customer trust" and "compete unfairly" with honest sellers. *See* Complaint ¶¶ 5-7 in *Amazon v. Rebatest, Inc.*, No. 22-2-02588-3-SEA (Super. Ct. State of Washington, King County).

69. Aster's Victoner brand sent customers a "giveaway" of a $20 amazon giftcard in exchange for leaving a 5-star review (ASIN: B08JVCPWK8).




70. Another customer was offered an Amazon gift card of $40 to leave a 5-star review of a True Image Product.




71.     Another customer was "offered a sizeable gift card to leave a 5 star review"
of an Aztech product.



72.     Again, these are only examples of systematic practices. As further detailed
below, Amazon does not permit sellers to incentivize or compensate purchasers for reviews
of the seller's products. In fact, Amazon does not even allow sellers to communicate with
purchasers outside of the Amazon messaging platform, which does not share customer
contact information. By communicating directly with customers Aster has circumvented
Amazon rules. By offering to compensate customers for favorable reviews (or for removal
of negative reviews) Aster further violates Amazon rules and falsely advertises its products.
Amazon considers undisclosed incentivized reviews to be "inherently false and
misleading."

73.     These are not the only indicia that Aster used has systematically false ratings
and reviews or otherwise manipulated the Amazon algorithm. Another leading indicator
relates to the statistically inexplicable volume of reviews and elevated product ratings
enjoyed by Defendants' products on Amazon.

74.     OEM-brand replacement toner typically is the top-selling brand for any given
printer. That is, not surprisingly, Hewlett-Packard brand toners typically lead sales on
Amazon for replacement toner compatible with Hewlett-Packard brand printers—and

frequently by a significant margin. Despite these greater sales (and thus greater opportunity for reviews), however, the volume of reviews and product ratings for Aster's competing third-party toners and toner products frequently outpace the OEM offering by a statistically unexplainable margin.

75.     Reviews and ratings for Hewlett-Packard's 414A toner (compatible with a number of HP OfficeJet printers) are illustrative. Amazon sells the OEM-brand HP 414A toner (ASIN: B07R5W5H4L), while Aster's True Image brand sells the compatible third-party private label HP 414A toner (ASIN: B083FF4B1X). The True Image brand has sold 8,761 HP 414A units on Amazon as compared to the OEM brand, which has sold 101,735 units. Notwithstanding that its sales represent just 8.6 percent of the OEM-brand sales, the True Image product has amassed 387 positive product reviews on Amazon while the OEM-brand has only 30 positive reviews. This is not merely an anomaly, as there are many such examples.

**<u>Repurposing Product Listings</u>**

76.     Another deceptive tactic used by Defendants is to repurpose an old product listing to the listing for a brand new product, in order to falsely reflect the old product's sales history, review history, and product rating, thus ensuring a higher organic search result from the time the new product is launched. This includes both (i) reusing older product listings (and their accompanying review history) with new product offerings in order falsely to capitalize on past sales and review history for new products and (ii) "variation" manipulation achieved by falsely treating different toner and ink products as variations of a single offering in order falsely to share in the ratings, reviews, and status of each other.

…

77.     Here, Aster repurposed an old listing for its Toner Bank brand HP 202x-compatible toner. This is evident for two reasons. First, the OEM HP 202x was not introduced to the market until September 2017, while the Toner Bank third-party offering (which necessarily lagged behind that product release) purports to have been available since August 2016. This indicates that the product listing from an old product has been reused here by Toner Bank. Second, reviews attached to the listing—which, again, is for an HP-compatible toner—refer to how well the *Brother* product works (red and blue text added for clarity; not part of the original image):



78.     Variation manipulation involves creating false "variations" of high-selling or well-established products under a single product ASIN in order to take advantage of the ratings, reviews, and any "#1 Best Seller" or "Amazon's Choice" badges of those high-selling or well-established products. The Amazon variation relationship is designed for linking products such as different sizes or colors of a single shirt, or a single dietary supplement that comes in 100- or 200-count bottles. In those situations, it makes sense that each "variation" would share in any Amazon badges and in the total number of ratings and

reviews and the average star rating for all the products in the variation relationship. By contrast, the Federal Trade Commission has explained that including unrelated products as variations in order to "borrow" the ratings and reviews of the top-sellers for new or different products is "false and misleading," and amounts to unfair or deceptive acts or practices and false advertising in violation of Sections 5(a) and 12 of the Federal Trade Commission Act.[18] Once the false product "variations" have taken advantage of the "borrowed" ratings and reviews of the better-selling product to which they are linked, they often are de-linked but continue to benefit from the reviews and ratings falsely attributed to them.

79.    Aster engages in extensive variation manipulation. Each product unfairly benefits from inflated sales rank, number of reviews, and ratings. While not exhaustive, the following examples are readily discernible on Amazon and Aster engages in this "false and misleading" practice across numerous product offerings.

…

---

[18] *See* FTC's Complaint at ¶¶ 4, 12-13, 23-25 in *In the Matter of the Bountiful Company*, 2023 WL 2182055 (F.T.C.).

80.     Here Aster brand Toner Bank falsely linked thirteen "variations" so each has the same reviews. Each product shares the benefit of increased sales rank and the exact same 3,203 reviews. In fact, these "variations" are different products entirely. These variations include: Brother TN850 (ASIN B09QPKS7T5), Brother TN 660 (ASIN B09KN6XBF4), Canon 054 (ASIN B09HQP43MT), HP 414A (ASIN B08ZN3QRFM), Brother TN880 (ASIN B09ZDK6CBX), HP 48A (ASIN B07M7H3J1D), Canon 054H (ASIN B09QS8RJXW), HP 94X (ASIN B09RQQ8Q47), Brother TN 660 (ASIN B0BTHQN9T2), HP 414X (ASIN B09VGVPYDK), Canon 045 (ASIN B09S331N6B), HP 655A (ASIN B07MFT3QFT), Brother TN850 (ASIN B09W2KTFFZ). As the FTC explains, this is "false and misleading." Image depicts two of thirteen linked "variations":



…

81.    In another example, Aster brand True Image lists five ASINS for completely different products as variations: HP 414X (ASIN B084QC5CVB), Canon 055H (ASIN B088GV9MDG), Canon 054 (ASIN B07VF4PL7W), HP 206X (ASIN B086PV1Z1Y), HP414A (ASIN B083FF4B1X). Each falsely shares inflated sales rank and the exact same 7,913 product reviews.  Image depicts two of five linked "variations":



…

82.   In another example, Aster brand Amstech falsely links nineteen different listings for completely different products as variations: Brother TN850 (ASIN B0BZP7R4GZ), HP 414A (ASIN B0BWY2NGFZ), Canon 054H (ASIN B0BQ5ZSM6R), Canon 055 (ASIN B0BNMWYVKJ), Brother TN760 (ASIN B0BKPK1V7G), HP CF258X (ASIN B0BGS4PN6F), TN 433 (ASIN B0BJNQ7XDZ), Brother TN227 (ASIN B0BGL1T68M), Canon 055H (ASIN B0BGS9YWZ5), HP 78A (ASIN B0BCVD5GWD), Brother TN433 (ASIN B0B7WZW2DQ), HP 78A (ASIN B0B7X8C45B), HP 80A (ASIN B0B8GHMHW9), Cannon 055 (ASIN B0B5GT3BNX), HP508A (ASIN B0B1T9L8G7), HP 80X (ASIN B0B1TGCB8W), HP 94A (ASIN B0B1TRVRFK), HP 05A (ASIN B0B1ZL4248), Canon 055 (ASIN B0BGS9YWZ5). Each shares the inflated sales rank and the exact same 1,934 reviews. Image depicts two of nineteen linked "variations":




83.     Likewise, Aster brand Victoner falsely links thirteen listings for thirteen completely different products as variations: HP 206A (ASIN B0BLSK3K6D), Brother TN 227 (ASIN B09XQSMZXX), HP 414X (ASIN B0BGPC6S4M), HP 206A (ASIN B0BLSK3K6D), HP206X (ASIN B0BLSKQC24), Canon 051 (ASIN B08W9GZXT2), Canon 051 (ASIN B09BC6VPCV), HP 414A (ASIN B0BTKXYL5X), Canon 051H (ASIN B09ZTWB817), Brother TN 227 (ASIN B09YXW8Z38), HP507X (ASIN B09WR2QYVT), HP 410A (ASIN B09YTX8TLQ), HP 12A (ASIN B0BS976NL3). Each shares the inflated sales ranks and same 1,554 reviews. Image depicts two of thirteen linked "variations":



…

84.    Here, Aster brand Cool Toner falsely links six listings for six completely different products as variations: HP78A (ASIN B007PKF9U4), Samsung CLT-504S (ASIN B01J7OOMKS), Brother TN 880 (ASIN B09LLS2VW7), HP 78A (ASIN B00J49M5ZG), HP 305X (ASIN B07874KYZ2), HP 49A (ASIN B01J7OOH1W). Each shares the inflated sales ranks and same 2,120 reviews.  Image depicts two of six linked "variations":



…

85.     Here, Aster brand Aztech falsely links four listings for four completely different products as variations: HP 81A (ASIN B08ZJ39YZZ), Canon 055 (ASIN B08XVVZH67), HP 81X (ASIN B08WRXDSM9), HP 05A (ASIN B07VB8FPD2). Each shares the inflated sales ranks and same 2,011 reviews. Image depicts two of four linked "variations":







86.     As noted, these are merely some examples of Aster's systematic "false and misleading" practice.

## Seller Controlled Amazon Customer Accounts for Fake Reviews

87.     Aster brand listings are filled with reviews containing pictures of unopened ink cartridges, often commenting, implausibly, on the quality of prints or how long the …

(as-yet unopened) cartridge lasted. These reviews are left by the sellers posing as customers in order to inflate ratings, reviews, and sales.

88.    An example of one such reviewer, Amazon "customer" Tas Cas, left eight different 5-star toner reviews for a wide variety of printers of Aster brands, True Image, Toner Bank, Cool Toner, and Aztech, over the course of three months, including pictures of unused toners, and often among the first to leave a review for that listing. The following images show four of those eight reviews:

…

## Customer Review

 Tas Cas

⭐⭐⭐⭐⭐ **Easy to install, straight forward**

Reviewed in the United States on July 30, 2021

**Verified Purchase**

Bought this for our shop printer, we go through a decent amount of pages. The toner was easy to install and the print quality was good! Not sure how long this toner will last but I'll try to update when we run out



**Product Details**

 TRUE IMAGE Compatible Toner Ca... by TRUE IMAGE

⭐⭐⭐⭐⯪ 4.4 out of 5

3,313 global ratings



| | |
|---|---|
| 5 star | 72% |
| 4 star | 12% |
| 3 star | 6% |
| 2 star | 2% |
| 1 star | 8% |

## Customer Review

 Tas Cas

⭐⭐⭐⭐⭐ **Easy install and compatible**

Reviewed in the United States on August 20, 2021

This toner was compatible with my laser jet printer and it was pretty straightforward in the installation... can't say for how long it last but so far the quality of print is good!

| Helpful | Report | Permalink |
|---|---|---|

**Product Details**

 Toner Bank Compatible Toner Car... by Toner Bank

⭐⭐⭐⭐☆ 3.8 out of 5

853 global ratings

| | |
|---|---|
| 5 star | 56% |
| 4 star | 13% |
| 3 star | 6% |
| 2 star | 4% |
| 1 star | 21% |

## Customer Review

 Tas Cas

⭐⭐⭐⭐⭐ **Good quality**

Reviewed in the United States on August 20, 2021

**Verified Purchase**

This drum unit fit perfectly in my brother printer! The seller shipped it fairly quickly and it came in good packaging. Just note that this isn't toner... just the drum!

| Helpful | Report | Permalink |
|---|---|---|

**Product Details**

 Cool Toner Compatible DR820 DR... by Cool Toner

⭐⭐⭐⭐⯪ 4.4 out of 5

59 global ratings



| | |
|---|---|
| 5 star | 75% |
| 4 star | 11% |
| 3 star | 5% |
| 2 star | 0% |
| 1 star | 9% |

## Customer Review

 Tas Cas

⭐⭐⭐⭐⭐ **Fast delivery and good quality**

Reviewed in the United States on October 21, 2021

**Verified Purchase**

This was easy to install. The print quality seems decent and shipping was fast

| Helpful | Report | Permalink |
|---|---|---|

**Product Details**

 Aztech Compatible Toner Cartridg... by Aztech

⭐⭐⭐⭐☆ 3.9 out of 5

1,378 global ratings



| | |
|---|---|
| 5 star | 58% |
| 4 star | 14% |
| 3 star | 5% |
| 2 star | 3% |
| 1 star | 20% |

89.     The following screen grab is all eight reviews left by Amazon "customer" Tas Cas, all 5-star reviews of Aster brands within a three-month period:



…

90.     In one of these eight reviews left by Amazon "customer" Tas Cas, the orange cover is still on the printing ink showing that it is clearly unused:



91.     Aster's acts are false and have deceived consumers. As a result of these acts, ML Products Inc. has lost sales of competing products.

92.     Through the conduct described herein, Aster and its controlled brands and shell companies sell nearly $50 million per year worth of replacement ink and toner on Amazon, accounting for more than 10 percent of the market for same.

**C. Defendants' Unfair Competition Inflates Their Sales at the Expense of Honest Sellers**

93.     As set forth throughout this Complaint, Defendants use deceptive practices to market and sell their products, including: crowding the field with multiple alter ego seller accounts; false product reviews; compensated or incentivized product reviews (including compensation for removal or change of negative reviews); ghost accounts to show false product interest or sales, and to inflate product ratings; and review repurposing via recycling old product listings to falsely portray an existing sales and review history for new products and creating false product "variations" to share in ratings, reviews, and status.

94.    Defendants engage in this deceptive conduct, in short, because it works. They know that review volume and content are critical to sales on Amazon. According to seller consultant Chris McCabe, a former Amazon employee, a product with a lot of reviews is more likely to appear on the first page of keyword search results.[19] *The Markup* reports that after price and shipping, the number of product reviews is the single most important purchase-driving factor for Amazon shoppers, citing a 2020 survey conducted by e-commerce firm Tinuiti.[20]

95.    Seller consultant McCabe further notes that sellers "need quantity [of product reviews], or they start dropping in sales rank." A product with a lot of reviews is more likely to appear on the first page of keyword search results, according to McCabe.[21] The *New York Times* has likewise concluded that review "volume" can make a big difference in a product's sales.

96.    Review content is likewise critical to sales. A 2020 PCMag survey found that 78% of US shoppers who planned to buy tech products on Amazon Prime Day that year agreed that Amazon product reviews play a big role in their purchase decisions.[22]

97.    Defendants know that their fastest route to occupying the top search results is to pile up positive reviews and make sure that any legitimate negative reviews are neutralized or deleted.

98.    An expose by BuzzFeed News looked closely at the "Fake Review Economy" on Amazon, concluding that product reviews are a seller's best chance to stand out in the crowded marketplace. Citing survey data in which fully 87 percent of consumers said a

---

[19] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).
[20] Is This Amazon Review Bullshit? (Jon Keegan. July 21, 2020) https://themarkup.org/ask-the-markup/2020/07/21/how-to-spot-fake-amazon-product-reviews (Last visited Nov. 12, 2021).
[21] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).
[22] How to Spot a Fake Review on Amazon (Jason Cohen. June 21, 2021) https://www.pcmag.com/how-to/spot-a-fake-review-on-amazon (Last visited Nov. 12, 2021).

positive review confirmed their decision to purchase a product, the authors concluded that "The best way to make it on Amazon is with positive reviews, and the best way to get positive reviews is to buy them."[23]

99.     Reviews are, in fact, for sale. A number of "black hat" companies offers sellers of Amazon products in the U.S. a menu of tactics designed to manipulate Amazon's ranking system to promote products, according to BuzzFeed. For instance, one company simply charges sellers "as much as $10,000 a month to help Amazon sellers appear at the top of product search results. Other tactics to promote sellers' products include removing negative reviews from product pages and exploiting technical loopholes on Amazon's site to lift products' overall sales rankings." Consultants offer "thumbs-up" clicks on a product review (suggesting the review was helpful), removal of negative reviews, or other services which help increase the overall star rating for a product. Black hat consultants offer to obtain customer email addresses for sellers so that sellers may contact them directly—which is against Amazon rules. As BuzzFeed notes, such offerings "make it harder for Amazon sellers who abide by the company's terms of service to succeed in the marketplace, and sellers who rely on these tactics mislead customers…."[24]

100.   One seller told BuzzFeed that before he engaged one of the black hat consultants he would barely break even on sales because the cost of advertising on Amazon is so high. He now makes about $3 million per year in net profits, but before he used the consultant's services he was making $73,000 per year.[25]

…

---

[23] Inside Amazon's Fake Review Economy (Nicole Nguyen. May 7, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-fake-review-problem (Last visited Nov. 12, 2021).
[24] Some Amazon Sellers Are Paying $10,00 A Month To Trick Their Way To The Top (Leticia Miranda. April 24, 2019) https://www.buzzfeednews.com/article/leticiamiranda/amazon-marketplace-sellers-black-hat-scams-search-rankings (Nov. 12, 2021).
[25] *Id.*

101.    According to the *Wall Street Journal*, "click farms that manage thousands of Amazon accounts" have proliferated. "In China, for example, some secretive businesses rent or sell accounts so that merchants can use them to make purchases and leave positive reviews."[26] Often, merchants use Facebook groups to incentivize fake reviews. Again, according to the *Wall Street Journal*, "Sellers, often out of China, post about free products, say Bluetooth headphones. The buyer gets the Amazon link from the seller via direct message, orders the headphones through Amazon so it can appear as a 'Verified Purchase,' then writes the review, posts some photos and rates it five stars. Once proof of purchase is provided, the seller refunds the buyer, generally via PayPal."[27]

102.    Nor do sellers rely solely on fake reviews. Simply clicking to indicate that a particular review (whether bona fide or fabricated) was "Helpful" pushes that review higher for the product in question. As BuzzFeed reported, sellers "hire people to hit the 'Helpful' button on a review so that it appears first" among reviews.[28]

103.    In the fall of 2019, Amazon launched its one-tap rating system, which allowed customers to submit a product star rating without accompanying review text. These ratings also increase sales. As the *New York Times* reported, an increase a single "star" in an Amazon product rating "correlates with a 26 percent increase in sales, according to a recent analysis by the e-commerce consulting firm Pattern."[29]

…

---

[26] How Sellers Trick Amazon to Boost Sales (Laura Stevens. July 28, 2018) https://www.wsj.com/articles/how-sellers-trick-amazon-to-boost-sales-1532750493 (Last visited Nov. 12, 2021).
[27] Is It Really Five Stars? How to Spot Fake Amazon Reviews (Joanna Stern. Dec. 20, 2018) https://www.wsj.com/articles/is-it-really-five-stars-how-to-spot-fake-amazon-reviews-11545314400 (Last visited Nov. 12, 2021).
[28] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12 2021).
[29] When Is a Star Not Always a Star? When It's an Online Review (Sapna Maheshwari. Nov. 28, 2019) https://www.nytimes.com/2019/11/28/business/online-reviews-fake.html (Nov. 12, 2021).

104.    An August 2021 paper published by researchers at UCLA and USC concluded that "rating manipulation has a large causal effect on sales."[30] The authors found that when firms stopped using fake reviews, their average ratings fell, the share of one-star reviews increased significantly, thus indicating that rating manipulation "is deceiving and harming consumers." The study observed "a substantial increase in search position and sales rank" in the period after sellers purchase fake reviews and found that the false ratings evidence "primarily supports the consumer harm view."[31]

105.    The academic study concludes that in addition to harming consumers, "rating manipulation likely harms honest sellers and the platform's reputation itself." If consumers become more skeptical of new and highly rated products, "[t]his, in turn, would make it harder for new, high-quality sellers to enter the market and would likely reduce innovation."[32]

106.    A recent *Wall Street Journal* story addressed seller tactics similar to those employed by Defendants as recounted above. It noted that some sellers track down customers who leave negative feedback on Amazon listings and pester—or bribe—them to delete or change those reviews. One seller sent multiple messages to a consumer's personal email after the consumer left a two-star review for a $17 finger brace, offering "escalating monetary incentives to delete the [negative] review, from $10 to finally $40."[33] Another *Wall Street Journal* article described a seller's offer "We are willing to refund in full," and "We hope you can reconsider deleting comments at your convenience okay?" When the consumer requested a refund but did not want to delete her review, another representative refused to provide the refund. A refund of $20 (twice the amount the

---

[30]    *See* Sherry He, Brett Hollenbeck, and Davide Proserpio, The Market for Fake Reviews (Aug. 2021), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3664992 (last visited Oct. 1, 2021).
[31] *Id.* at pp. 4-5.
[32] *Id.* at 53.
[33] Fake Reviews and Inflated Ratings Are Still a Problem for Amazon (Nicole Nguyen. June 13, 2021) https://www.wsj.com/articles/fake-reviews-and-inflated-ratings-are-still-a-problem-for-amazon-11623587313 (Last visited Nov. 12, 2021).

customer paid) was offered if only the review would be deleted. Amazon's terms of service prohibit sellers from requesting that a customer remove a negative review or post a positive one.[34]

107.    Paying for reviews or paying consumers to change or delete negative reviews are not the only tactics sellers use to falsely portray products. When a product is new to the market, it begins with no sales or review history upon which to rely. As BuzzFeed News again observed, unscrupulous sellers "take an existing product page, then update the photo and description to show an entirely different product. By retaining all the existing reviews, the new product looks more tested and legitimate to shoppers – and in the world of online reviews, quantity is key. More ratings make a product appear to be more well-reviewed and, ultimately, boosts sales." A Federal Trade Commission representative confirmed that "it's deceptive to misrepresent that reviews for one product apply to a different product."[35]

108.    This method of deception is sometimes called "brushing." The *Wall Street Journal* chronicled a blackhead-remover mask from a merchant that Amazon listed as "just launched," that already had hundreds of reviews, averaging 4.3 stars. However, only the first four reviews related to the mask, while all of the others evaluated a battery charger. According to the *Journal*, the seller "likely co-opted an old listing with positive reviews and changed the product's image and description to fool Amazon's algorithms, according to sellers and consultants familiar with this general practice."[36]

…

---

[34] When Amazon Customers Leave Negative Reviews, Some Sellers Hunt Them Down (Nicole Nguyen. Aug. 8, 2021) https://www.wsj.com/articles/when-amazon-customers-leave-negative-reviews-some-sellers-hunt-them-down-11628420400 (Last visited Nov. 12, 2021).
[35] Here's Another Kind Of Review Fraud Happening On Amazon (Nicole Nguyen. May 29, 2018) https://www.buzzfeednews.com/article/nicolenguyen/amazon-review-reuse-fraud (Last visited Nov. 12, 2021).
[36] How Sellers Trick Amazon to Boost Sales (Laura Stevens. July 28, 2018) https://www.wsj.com/articles/how-sellers-trick-amazon-to-boost-sales-1532750493 (Last visited Nov. 12, 2021).

COMPLAINT

109.    The practices that succeed in inflating sales are the types of deceptive practices engaged in by the Defendants. Those practices have been successful in inflating Defendants' sales at the expense of sales by Plaintiff.

**D. False Reviews and Sales Rank Manipulation Are Deceptive and Unfair Methods of Competition**

110.    The practices engaged in by Defendants and complained of throughout this Complaint have been deemed deceptive and unfair methods of competition.

111.    In 2019, the Federal Trade Commission (FTC) filed a lawsuit against a company that allegedly paid a third party to generate false reviews and inflated star ratings for its product, which was sold exclusively on Amazon.[37] The FTC asserted that these fabricated reviews constituted "unfair or deceptive acts or practices in or affecting commerce," in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

112.    The case was resolved within a week, with the seller-defendant agreeing to injunctive relief and a $12.8 million judgment. Andrew Smith, Director of the FTC's Bureau of Consumer Protection, said in a statement: "People rely on reviews when they're shopping online[.] When a company buys fake reviews to inflate its Amazon ratings, it hurts both shoppers and companies that play by the rules."[38]

113.    Seller conduct on the Amazon marketplace is governed by Amazon's rules. First and foremost, the Amazon seller code of conduct requires that all sellers must "provide accurate information to Amazon and our customers at all times." This means that sellers "must use a business name that accurately identifies your business…."

114.    Sellers must also "not attempt to influence customers' ratings, feedback and reviews." In particular, the seller code of conduct prohibits sellers from "send[ing] unsolicited or inappropriate communications" or "contact[ing] customers" except through

---

[37] *Federal Trade Commission v. Cure Encapsulations, Inc., et al.*, No. 19-cv-982 (E.D.N.Y.).
[38] Feb. 26, 2019 FTC Press Release, available at https://www.ftc.gov/news-events/press-releases/2019/02/ftc-brings-first-case-challenging-fake-paid-reviews-independent (last viewed Nov. 12, 2021).

Amazon's Buyer-Seller Messaging system (which does not share buyer direct contact information with sellers).

115.   The Amazon seller code of conduct specifically states that "Examples of unfair activities include: Manipulating sales rank (such as by accepting fake orders or orders that you have paid for)." Amazon's rules dictate, among other things, that "[a]ny attempt to manipulate reviews, including by directly or indirectly contributing false, misleading or inauthentic content, is strictly prohibited" on the Amazon online platform.[39]

116.   Further directives specify that sellers "may not attempt to influence or inflate customers' ratings, feedback, and reviews," and may not "pay for or offer an incentive (such as coupons or free products) in exchange for providing or removing feedback or reviews." Sellers may not ask customers to remove or change a review.[40]

117.   The seller code of conduct also indicates that sellers must "not operate more than one selling account on Amazon without a legitimate business need." Amazon's Selling Policies and Seller Code of Conduct restrict sellers from operating multiple selling accounts. Absent a "legitimate business need," a seller may maintain only one Seller Central account for each region in which it sells. Owning multiple brands is a "legitimate business justification" only if the seller maintains separate businesses for each.

118.   Defendants' blatant and consistent violation of the Amazon rules, which are designed to provide consumers with honest information and secure a fair playing field for honest competition, is unlawful under the Lanham Act and California law as asserted below.

…

---

[39] Anti-Manipulation Policy for Customer Reviews, AMAZON
https://www.amazon.com/gp/help/customer/display.html?nodeId=201996120#:~:text=Reviews%20provide%20a%20forum%20for,our%20reviews%20platform%20very%20seriously. (last visited Nov. 12, 2021).
[40] *Id.*

119.   On October 13, 2021, the Federal Trade Commission issued a warning to hundreds of businesses about fake reviews and misleading product endorsements. The FTC outlined seven practices that it considers deceptive or unfair conduct:

- It is an unfair or deceptive trade practice to make claims which represent, expressly or by implication, that a third party has endorsed a product or its performance when such third party has not in fact endorsed such product or its performance.

- It is an unfair or deceptive trade practice for an advertiser to misrepresent that an endorsement represents the experience, views, or opinions of users or purported users of the product.

- It is an unfair or deceptive trade practice to misrepresent an endorser as an actual user, a current user, or a recent user of a product or service.

- It is an unfair or deceptive trade practice for an advertiser to continue to advertise an endorsement unless the advertiser has good reason to believe that the endorser continues to subscribe to the views presented in the endorsement.

- It is an unfair or deceptive trade practice for an advertiser to use testimonials to make unsubstantiated or otherwise deceptive performance claims even if such testimonials are genuine.

- It is an unfair or deceptive trade practice to fail to disclose a connection between an endorser and the seller of an advertised product or service, if such a connection might materially affect the weight or credibility of the endorsement and if the connection would not be reasonably expected by consumers.

- It is an unfair or deceptive trade practice to misrepresent explicitly or implicitly through the use of testimonials that the experience described by endorsers of a product or service represents the typical or ordinary experience of users of the product or service.

Each of the Defendants operate or have operated in a manner that would be considered deceptive or unfair conduct under the FTC warning letter.

120.   On or about July 31, 2023, the FTC commenced a rulemaking to promulgate a trade regulation rule entitled "Rule on the Use of Consumer Reviews and Testimonials" (hereafter the "Rule," available at Fed. Reg. Vol. 88, No. 145 (July 31, 2023)[41]). In particular, FTC proposed to amend title 16 C.F.R. ch. I, subch. D to add the Rule as Part 465. The rulemaking is based on the FTC's conclusions that fake consumer reviews, the "unfair or deceptive reuse or repurposing of consumer reviews" and the "giving of incentives for reviews" all are "prevalent." Fed. Reg. Vol. 88, No. 145 at p. 49373, 49374. Accordingly, proposed Rule 465 would proscribe:

- as "an unfair or deceptive act or practice … for a business to purchase a consumer review, or to disseminate or cause the dissemination of a consumer testimonial" when the business knows or should know that the review involves a reviewer "who does not exist," who "did not use or otherwise have experience with the product," or when it "materially misrepresents … the reviewer's experience with the product." (Rule 465.2(b));

- as "an unfair or deceptive act or practice" a business's procurement of the same types of false reviews "for posting on a third-party platform or website." (Rule 465.2(c)); and

- as "an unfair or deceptive act or practice" the "use or repurpos[ing of] a consumer review written or created for one product so that it appears to have been written or created for a substantially different product, or to cause such use or repurposing." (Rule 465.3.).

…

---

[41] A copy was previously filed in *ML Products v. Ninestar Technology Co., Ltd., et al.*, No. 21-cv-1930-MEMF-KK as Exhibit 1 to the Declaration of Leigh M. Perica (Dkt. 145-1) accompanying Plaintiff's August 23, 2023 Second Notice of Supplemental Authority (Dkt. 144).

121.    The Rule is designed to allow FTC "to more effectively police harmful review and testimonial practices that plague consumers and honest businesses." *Id.* at p. 49378. FTC opines that the Rule will generate benefits "related to competition." In particular, "fake online reviews allow companies to surpass competitors" and "by curbing the number of fake or manipulated reviews, the proposed Rule would benefit consumers by improving the competitive environment for legitimate firms selling higher-quality products (*i.e.*, those who do not rely on review manipulation to sell their goods)." *Id.* at p. 49385. The Rule addresses the FTC's conclusion that using or procuring fake reviews or repurposing of reviews for unrelated products is both "deceptive" and constitutes an "unfair" practice, violating the policy or spirit of the FTC Act, 15 U.S.C. 45(a)(1).

**E. ML Products' Injury**

122.    ML Products is an online distributor and retailer based in Los Angeles, California that has sold various kinds of toner and ink since 1999, making sales to wholesalers, retailers, and consumers. ML Products began selling third-party private label ink and toner on Amazon in 2018 and has continued to sell these products on Amazon since that time, in direct competition with Defendants.

123.    ML Products has a lengthy track record as a successful toner and ink supply company over its 20-plus year existence. Prior to 2018, ML Products focused on direct to consumer sales of ink and toner. As the Amazon market became more and more powerful, and as more consumers flocked to Amazon as the starting place for search and the go-to marketplace for anything, a selling presence on Amazon became a commercial necessity for online retail sales.

124.    ML Products identified high-demand ink and toner cartridges and was quick to the market, initially establishing itself as one of the top 1 percent of all Amazon sellers that cross the $1 million mark in yearly sales.[42] At that time, ML Products quickly rose to the top of Amazon's organic listings for large market inks and toners and had instant

---

[42] https://landingcube.com/amazon-statistics/

success. While ML Products has continued to grow its Amazon sales revenues each year since, with an average growth of approximately 33% year-over-year, its search rankings quickly dropped due Defendants' conduct as described herein.

125. ML Products attempted to compete with Defendants through a combination of sponsored ads and regular listings, but simply could not compete on the products that Defendants decided to sell. Without engaging in the same conduct as Defendants—*i.e.*, false reviews and ratings and crowding the field with multiple shell company sellers under the control of and for the benefit of a single entity—honest sellers like ML Products are unable to earn the top organic search results and thus unable to compete with Defendants who thereby dominate third-party sales of replacement ink and toner.

126. Unable to compete in the lucrative high volume toner and ink cartridges that comprise most of the market, ML Products has been forced to concentrate on sales of smaller, niche ink and toner products that are not worth Defendants deceptive marketing and cheating efforts.

127. Absent Defendants' conduct as complained of herein, ML Products would have continued to succeed in sales of high-demand ink and toner cartridges as it set out to do, and would have won a substantial portion of the sales for ink and toner cartridges that Defendants have sold since that time.

128. The Defendants, through the tactics described in this complaint, do not merely dominate the existing market but they also foreclose the entry by honest sellers into that market, as honest sellers simply cannot compete with the unlawful tactics employed by Defendants.

129. ML Products has suffered, and will continue to suffer, injury as a direct, foreseeable, and proximate result of Defendants' conduct.

…

# V.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the Lanham Act (All Defendants)
### (15 U.S.C. § 1051 et seq.)

130.    Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

131.    Defendants, in connection with their products sold in interstate commerce have made and continue to make false statements of fact and false representations of fact as to the nature, characteristics, and quality of its products.

132.    Defendants have introduced their false and misleading statements into interstate commerce via marketing and false reviews on the Amazon.com online sales platform.

133.    Defendants' false and misleading statements of fact and misrepresentations of fact concerning its products were made, and continue to be made, in commercial advertising, promotions, and direct communications with consumers on the Amazon.com online sales platform in a manner material to the public's decision to purchase Defendants' products instead of those of their competitors, including Plaintiff.

134.    Defendants' false statements of fact and false representations of fact in promoting their products are false and misleading in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

135.    Defendants' false and misleading statements include fake customer reviews and promotional tactics and materials that Defendants have placed into interstate commerce in connection with the marketing of their products on the Amazon.com online sales platform.

136.    The above-described acts of Defendants actually deceived, or have the tendency to deceive, a substantial segment of consumers who see or read such representations and reviews on the Amazon.com online sales platform.

137.   The above-described acts of Defendants are material, in that they are likely to influence a consumer's purchasing decision.

138.   Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

139.   As demonstrated above, Defendants have intentionally and materially participated in a false and misleading campaign to promote and sell their products on the Amazon.com online sales platform.

140.   Defendants have competed unfairly with Plaintiff by manipulating Amazon's customer review system as described herein.

141.   As a result of Defendants' false and misleading advertising, Plaintiff has suffered a direct diversion of customers to Defendants and has been and will be deprived of substantial revenue in an amount to be determined at trial.

142.   Defendants have caused, and will continue to cause, immediate and irreparable injury to Plaintiff, including injury to its business, for which there is no adequate remedy at law. As such, Plaintiff is entitled to an injunction under 15 U.S.C. § 1116 restraining Defendants, their agents, employees, representatives and all persons acting in concert with them from engaging in further acts in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and ordering removal of all of Defendants' false advertising and falsely advertised product listings.

143.   Plaintiff is entitled under 15 U.S.C. § 1117 to actual damages to be determined at trial, to have such damages trebled, to disgorgement of Defendants' profits, and costs of the action.

144.   Defendants have acted in bad faith and have knowingly, willfully, and deliberately engaged in false advertising with the intent to deceive the public and injure their competitors, including Plaintiff. Thus, in addition to the relief requested herein, Plaintiff is entitled to reasonable attorney's fees pursuant to 25 U.S.C. § 1117(a).

…

# COUNT II
## Violation of California Unfair Competition Law Section 17200
### (All Defendants)
### (Cal. Bus. & Prof. Code § 17200, *et seq*.)

145.    Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

146.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

147.    Amazon's platforms are used in interstate commerce and throughout the world for the purposes of commercial advertising and promotion. Defendants have engaged in unlawful, unfair and fraudulent conduct by way of their false, deceptive, and misleading marketing, advertising, reviews and sale of their ink products on Amazon's online sales platforms. In particular, Defendants falsely represent to consumers that their reviews and ratings are legitimate, when in fact Defendants employ fake product reviews; compensation to customers for positive product reviews or removal of negative product reviews; "ghost" accounts to manufacture the false impression of interest in, or sales of, products; manipulation of the "helpful" voting for the (likely false) positive reviews of Defendants' products; review repurposing, including the recycling of old product ASINs (and their accompanying review history) for use with new product offerings and creating false product "variations" to share in ratings, reviews, and status; and Defendants' use of multiple seller accounts offering the same products to ensure the search results list their products as top products.

148.    Defendants' actions set forth herein constitute intentional business acts and practices that are unlawful, unfair, and fraudulent, including Defendants' manipulation of Amazon's customer review system and organic search algorithm.

149.    As demonstrated above, Defendants violated the Unfair Competition Law by making and continuing to make representations about their ink products that are clearly false and misleading, and Defendants have engaged in unlawful, unfair and fraudulent

conduct by way of their false, deceptive, and misleading misleading statements of fact and representations of fact as to the nature, characteristics, and quality of their products and product reviews to boost sales on Amazon.

150.   Defendants are likely to cause confusion, mistake, and deception as to the nature, characteristics, and quality of their products due to Defendants' manipulation of Amazon's customer review system and organic search algorithm.

151.   Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

152.   By reason of Defendants' acts of unfair competition, Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Defendant from any further acts of unfair competition. Defendant's continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Plaintiff in that he will have no adequate remedy at law to compel Defendants to cease such acts, and no way to determine his losses proximately caused by such acts of Defendant. Plaintiff is therefore entitled to a preliminary injunction and a permanent injunction against further unlawful, unfair, and fraudulent conduct by Defendants, as well as removal of all of Defendants' false advertising and falsely advertised product listings.

153.   As a direct and proximate result of Defendants' acts of unfair competition, Defendant has wrongfully taken Plaintiff's profits and sales, as well as his substantial investment of time, energy and money. Defendants should therefore be ordered to perform full restitution to Plaintiff as a consequence of Defendants' unlawful, unfair, and fraudulent activities.

## COUNT III
### Violation of California False Advertising Law (All Defendants)
### (Cal. Bus. & Prof. Code § 17500, *et seq.*)

154.   Plaintiff incorporates by reference and re-alleges all paragraphs previously stated herein.

…

155.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

156.   Defendants violated Business and Professions Code section 17500 by making or disseminating, or causing to be made or disseminated, before the public in this State, deceptive, untrue or misleading statements in connection with the sale of goods on Amazon's online sales platforms, that Defendants knew, or in the exercise of reasonable care should have known were deceptive, untrue or misleading concerning the sale of Defendants' product and were likely to mislead or deceive a reasonable consumer.

157.   For example, and without limitation, Defendants purposely made false and misleading statements through the manipulation of customer product reviews and the creation of false product reviews to boost Defendants' profiles and sales on Amazon. Plaintiff directly competes with Defendants in the consumer replacement ink and toner industry.

158.   Defendants are likely to cause confusion, mistake, and deception as to the nature, characteristics, and quality of their products due to Defendants' manipulation of Amazon's customer review system and organic search algorithm.

159.   By reason of Defendants' deceptive, untrue, and misleading advertising, Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Defendants from any further acts of deceptive, untrue, and misleading advertising. Defendants' continuing acts of deceptive, untrue, and misleading advertising, unless enjoined, will cause irreparable damage to Plaintiff in that he will have no adequate remedy at law to compel Defendants to cease such acts, and no way to

determine his losses proximately caused by such acts of Defendants. Plaintiff is therefore entitled to a preliminary injunction and a permanent injunction against further deceptive, untrue, and misleading advertising by Defendants, as well as removal of all of Defendants' false advertising and falsely advertised product listings.

160.   As a direct and proximate result of Defendants' acts of deceptive, untrue, and misleading advertising, Defendants have wrongfully taken Plaintiff's profits and his substantial investment of time, energy and money. Defendants should therefore be ordered to perform full restitution to Plaintiff as a consequence of Defendants' deceptive, untrue, and misleading advertising.

161.   Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in California which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of their products in violation of the False Advertising Law at Business & Professions Code § 17500, et seq.

# VI.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Damages under the aforesaid causes of action in the form of actual, damages, disgorgement of Defendants' profits, and an award of enhanced or treble damages, in an amount to be determined at trial;

B. An Order preliminarily and permanently enjoining Defendants from engaging in the false and unlawful conduct described in this lawsuit and removing all false advertising and all of Defendants' falsely advertised product listings;

C. An Order requiring Defendants to pay both pre and post judgment interest on any amounts awarded to the extent allowed by law;

D. An award of reasonable attorney's fees and costs of suit incurred herein;

E. Any further relief as the Court deems appropriate.

# VII.

# JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury for all issues so triable.

DATED: October 12, 2023

Respectfully Submitted,

**MCCUNE LAW GROUP,
MCCUNE WRIGHT AREVALO
VERCOSKI KUSEL WECK BRANDT,
APC**

*/s/ Richard D. McCune*

Richard D. McCune
18565 Jamboree Road, Suite 550
Irvine, CA 91761
T: (909) 557-1250
rdm@mccunewright.com

Derek Y. Brandt (*Pro Hac Vice*)
Leigh M. Perica (*Pro Hac Vice*)
Connor P. Lemire (*Pro Hac Vice*)
231 North Main Street, Suite 20
Edwardsville, IL 62025
T: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Dana R. Vogel (*Pro Hac Vice*)
2415 East Camelback Road, Suite 850
Phoenix, Arizona 85016
Telephone: 909-557-1250
drv@mccunewright.com

*Attorneys for Plaintiff*